**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ORALEAN WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-cv-8271 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO and RICHARD ADAMS, | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Oralean Williams brings claims against Defendants the City of Chicago and Richard Adams for racial and gender discrimination, hostile work environment, and retaliation under Title VII and 42 U.S.C. §§ 1981, 1983. Before the Court are the City's motion to dismiss Counts I, II, and IV [12] and Adams's motion to dismiss Count V [19]. For the reasons set forth below, the City's motion to dismiss [12] is granted in part and denied in part, and Adams's motion to dismiss [19] is granted in part and denied in part. The City's request to extend the time in which the City has to answer Count III is granted. Plaintiff is given until August 25, 2017 to file an amended complaint consistent with this opinion, if Plaintiff believes that she can overcome the deficiencies identified below. This case is set for further status hearing on August 31, 2017 at 9:00 a.m.

**I.      Background**

The following facts are drawn from Plaintiff's complaint [1] and the attached exhibits. Plaintiff, an African American female, began working for the City as a Motor Truck Driver in the Department of Streets and Sanitation in approximately 2000. For much of her employment, Plaintiff drove a sanitation truck. From approximately 2008 to July 2015, Plaintiff was stationed

1

at the yard located at 52nd Street and Oakley Avenue ("the yard"). [1, at ¶ 12.] In approximately May of 2014, Plaintiff was elevated to the position of "E-Person," which Plaintiff alleges was a "prestigious office and administrative position in the yard." Plaintiff alleges that at that time, she came under the "direct, daily supervision" of Defendant Adams. [*Id.*, at ¶ 13.] Plaintiff alleges upon information and belief that at all relevant times, Adams possessed and was delegated final policymaking authority for personnel issues arising within the Department of Streets and Sanitation at the yard. [*Id.*, at ¶ 14.]

Plaintiff contends that during the course of her employment with the City, she performed all of her duties and responsibilities in a satisfactory manner. Plaintiff alleges that beginning almost immediately after her appointment to the E-Person position, and continuing through July 2015 when she was finally transferred to another position, she was "a victim of a pattern and practice of race and gender discrimination and harassment, disparate treatment as to the terms and conditions of employment based upon race and gender, and retaliation for complaining about discrimination and harassment." [*Id.*, at ¶ 16.]

Specifically, Plaintiff makes the following allegations regarding harassment based on her gender: Plaintiff alleges that Adams subjected her to different and demeaning terms and conditions of employment "than her similarly situated male counterparts," including prohibiting her from entering the "shop" at the yard to check on the sanitation trucks despite the fact that her job required her to do so, prohibiting Plaintiff from using her cell phone during work while allowing "all other similarly situated males" to do so, refusing to provide or arrange for appropriate E-Person job training, and forcing Plaintiff to log incoming trucks while standing outdoors, instead of in the office window, even in the harshest of weather conditions. [*Id.*, at ¶ 17(a).] Plaintiff further alleges that Adams repeatedly "comment[ed] derogatorily to Plaintiff

about the fact that she was a woman and as such, should not have the E-Person position and stating that 'women should be at home.'" [*Id.*, at ¶ 17(b).] According to Plaintiff, Adams repeatedly screamed and "adopt[ed] a demeaning tone toward Plaintiff" and repeatedly used the exclamation "Women!" when walking away from Plaintiff following discussions. [*Id.*, at ¶¶ 17(c)–(d).] Adams allegedly made derogatory comments to Plaintiff such as, "You women are worthless" and stated that Plaintiff was "nothing a bullet won't cure." [*Id.*, at ¶¶ 17(e)–(f).] Adams allegedly implied that Plaintiff would never be good at her job unless she learned to lie on the ground and twist wires, while never indicating that any similarly situated male E-Person was required to do so. Plaintiff contends that these were not isolated incidents and that Adams engaged in this type of behavior "continually and on a daily basis, commonly in the presence of multiple Streets and Sanitation employees." [*Id.*, at ¶¶ 17–18.]

Plaintiff further alleges that Adams, whom Plaintiff describes as "not African-American," engaged in racially discriminatory and harassing behavior in the workplace on a daily basis. [*Id.*, at ¶ 20.] Specifically, Plaintiff contends that Adams repeatedly made reference to African American employees as "you black people" in a derogatory manner, repeatedly used the term "nigga," and permitted employees to use the word "nigger" if they put five dollars into the office "swear jar." [See *id.*, at ¶¶ 20(a), (b), (e) (f).] Plaintiff further contends that Adams ordered Plaintiff to "get a mop and start mopping" because "black people are good for mopping." [*Id.*, at ¶ 20(c).] Adams allegedly told Plaintiff that she knew how to "handle [her] people," which Plaintiff interpreted to mean black employees, and allegedly stated that black people should not have the E-Person position, referring to Plaintiff and another African American E-Person. [*Id.*, at ¶¶ 20(d), 20(g).] Plaintiff alleges that Adams told Plaintiff that black women are worthless and allowed "at least one" co-worker to refer to Plaintiff as the "Black E-Woman" without

repercussion. [*Id.*, at ¶¶ 20(j), (k).] Plaintiff also alleges that Adams stated out loud in Plaintiff's presence that he did not want his daughter to date a black man. [*Id.*, at ¶¶ 20(i), (j).] Additionally, Plaintiff alleges that Adams subjected her to different and demeaning terms and conditions of employment "than her similarly situated non-African-American counterparts," including prohibiting her from entering the "shop" at the yard to check on the sanitation trucks despite the fact that her job required her to do so, prohibiting Plaintiff from using her cell phone during work while allowing "all other similarly situated non-African American employees" to do so, refusing to provide or arrange for appropriate E-Person job training, and forcing Plaintiff to log incoming trucks while standing outdoors, instead of in the office window, even in the harshest of weather conditions. [*Id.*, at ¶ 20(h).] Plaintiff alleges that these actions by Adams created a racially hostile work environment.

Plaintiff contends that she complained about Adams's conduct to "an individual supervisor at the downtown Chicago office of the Department of Street and Sanitation" on several occasions during the early half of 2015. [*Id.*, at ¶ 23.] Plaintiff refers to this individual as "Jay" and alleges upon information and belief that his last name is Keag. [*Id.*, at ¶ 23 n.1.] Plaintiff asserts that Jay said he would talk to Adams but that Plaintiff noticed no difference in Adams's behavior and that no effective disciplinary action was taken. [*Id.*, at ¶ 23.] Plaintiff alleges that she further reported Adams's behavior to "several other supervisors on site," as well as the 16th Ward Superintendent, Nate Wilson. [*Id.*, at ¶ 24.] Additionally, Plaintiff allegedly prepared a written complaint and provided it to disciplinary officer Katrika Scott. [*Id.*] However, Plaintiff contends that no immediate or effective action was taken. Plaintiff alleges that she was told to report the misconduct to Janet Gay, Administrative Supervisor in the

downtown office of the Department of Streets and Sanitation, and that she eventually did so. [*Id.*]

According to Plaintiff, after her reports of discrimination, Defendants began a course of retaliation against Plaintiff that adversely affected the terms and conditions of her employment. Specifically, Plaintiff alleges that Adams responded to her complaints by falsely disciplining Plaintiff for "disrupting his yard." [*Id.*, at ¶ 25.] Plaintiff contends that she was later called into a meeting downtown with Streets and Sanitation supervisory personnel including Gay, Deputy Director Josie Cruz, and another person that Plaintiff refers to as "Ray." Plaintiff alleges that she was relieved of her duties as an E-Person and reassigned to another yard, where she was sent back to the motor pool to drive a sanitation truck instead of having an administrative position. [*Id.*, at ¶ 26.] Plaintiff asserts that she was not given the option of staying at her "more desirable and prestigious position of E-Person" and instead Adams reassigned her to another yard. [*Id.*]

Plaintiff alleges that at all relevant times, Gay, Cruz, Jay, and Ray were agents, servants, or employees of the City, and she alleges upon information and belief that each possessed and was delegated final policymaking authority for personnel issues arising within the Department of Streets and Sanitation. [*Id.*, at ¶ 27.] Plaintiff alleges that Gay, Cruz, Jay, Ray, and Adams never adequately responded to her complaints "and thereby approved, condoned, and/or turned a blind eye to the discrimination and harassment" by Adams. [*Id.*, at ¶ 28.]

Plaintiff filed a charge of discrimination based on race and gender with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter from the EEOC. [*Id.*, at ¶ 9.] Plaintiff then brought this lawsuit on August 23, 2016. [1.] Count I alleges race discrimination and a hostile work environment in violation of Title VII; Count II alleges gender discrimination and a hostile work

environment in violation of Title VII; Count III alleges retaliation in violation of Title VII; Count IV alleges a *Monell* claim against the City pursuant to 42 U.S.C. §§ 1981 and 1983; and Count V alleges an individual liability claim against Adams for discrimination, hostile work environment, and retaliation pursuant to 42 U.S.C. §§ 1981 and 1983. On October 25, 2016 the City filed a motion to dismiss Counts I, II, and IV [12], and on November 11, 2016, Adams filed a motion to dismiss Count V [19].

## II.      Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011).

### III.    Analysis

### A.    Race and Gender Discrimination: Disparate Treatment

Title VII makes it unlawful for an employer to discriminate against any individual "because of such individual's race [ ] or sex." 42 U.S.C. § 2000e–2(a)(1). To state a Title VII discrimination claim under a disparate treatment theory, a plaintiff must adequately allege that she suffered an adverse employment action that was motivated by discriminatory animus. See *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016); *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). "[A] materially adverse employment action is one which visits upon a plaintiff "a significant change in employment status." *Id.* at 917. Such changes can involve the employee's current wealth, career prospects, or unbearable changes to job conditions that amount to constructive discharge.[1] See *id; Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014); *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) ("For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (citation omitted)). The Seventh Circuit has defined adverse employment actions "quite broadly" but has explained that the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter*, 700 F.3d at 954 (citation and internal quotation marks omitted). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Id.* (citation and internal quotation marks omitted); see also *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d

---

[1] Although a plaintiff may establish a hostile work environment by showing that she has been subjected to severe or pervasive harassment, a "further showing" is necessary to establish a constructive discharge. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639 (7th Cir. 2009) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004)).

394, 406 (7th Cir. 2010) ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." (citation and internal quotation marks omitted)).

The City argues that Plaintiff's claims of disparate treatment should be dismissed for failure to allege a materially adverse employment action. According to the City, Plaintiff's allegations that Adams prohibited her from entering the "shop" area, prohibited her from using her cell phone, failed to provide E-Person training, and required her to log incoming trucks from outside the office are "gripes and inconveniences" that are insufficient to constitute a materially adverse employment action. Plaintiff argues that her allegations of a "daily barrage of racial epithets and gender-based slurs," along with the denial of training and diminished responsibilities, created a workplace that was humiliating, degrading, unsafe, and unhealthy, thus rising to the level of an adverse employment action.

Although the Court in no way condones Adams's alleged behavior, the Court concludes that Plaintiff has not sufficiently alleged a materially adverse employment action to support her disparate treatment claims based on gender and race discrimination. Plaintiff has not alleged any "significant changes" to her employment status that would affect her wealth or career prospects, such as a transfer, demotion, termination, or denial of a wage or employee benefit increase. See *Haugerud*, 259 F.3d at 691 (no adverse employment action where plaintiff "has not been disciplined, demoted, or terminated; [and] has not been denied wage or employee benefit increases"). Adams's alleged behavior, although humiliating and degrading, does not rise to the level that is necessary to demonstrate a "significant negative alteration in the workplace." *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 988 (N.D. Ill. 2016) (granting motion to dismiss on

8

discrimination claim and explaining that allegations that supervisors grabbed plaintiff's hair and touched her skin, screamed at her, and suggested she apply for the African American Leadership Council to the exclusion of other opportunities could be characterized as "humiliating" or "degrading," yet failed to rise to the level of a "significant negative alteration in the workplace"); *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002) (harassment or humiliation suffered by plaintiff during uniform inspection was not severe enough to constitute an adverse employment action); *Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837, 863 (N.D. Ill. 2009) (Plaintiff's allegations that he was told to worry about his "own kind," told that he should quit, followed to the washroom by "non-white manager," and "ridiculed by non-white employees who were never disciplined" did not rise to the level of adverse employment action).

Further, Plaintiff's allegations that Adams denied her training and intentionally interfered with the performance of her work duties do not rise to the level of an adverse employment action. See *Brown v. Advocate S. Suburban Hosp.*, at *6 (N.D. Ill. Dec. 20, 2011), aff'd, 700 F.3d 1101 (7th Cir. 2012) (denial of training opportunities would not constitute an adverse employment action); *Haugerud*, 259 F.3d at 691 (holding that plaintiff suffered no adverse employment action where she alleges that her employer tried to force her to give up her custodial position, told the male night custodians not to help the female day custodians, gave her additional responsibilities above what was expected of the male custodians and above that which she should have reasonably have been given, and intentionally interfered with the performance of her work duties).

Plaintiff's arguments focus on the cumulative effect of Adams's alleged behavior, but the Seventh Circuit has explained that a totality of the circumstances approach is appropriate for a hostile work environment claim but not for a discrimination claim. See *Boss*, 816 F.3d at 918

("Insofar as [plaintiff] argues for a 'totality of the circumstances' view, the caselaw limits that approach to his hostile work environment claims, which we consider below."); *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) ("[Plaintiff] would prefer that we broaden the scope of our review to include, essentially, the 'cumulative effect of individual acts,' or, as she calls it, [her supervisor's] 'course of action' against her, but she has raised a discrimination claim, not a hostile work environment one." (internal citations and quotation marks omitted)).  Thus, based on her existing complaint, Plaintiff has failed to state disparate treatment claims based on gender and race discrimination.[2]  See *Collins v. Meike*, 52 F. App'x 835, 837 (7th Cir. 2002) (plaintiff's allegations of "humiliating" reassignment and dissatisfaction with teaching assignments did not rise to the level of adverse employment action where plaintiff did not suffer a demotion, a failure to promote, a significant job reassignment, or a permanent loss of salary or benefits).

### B.    Hostile Work Environment

Title VII protects employees against a hostile work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (citation and internal quotation marks omitted).  To plead a hostile work environment claim, Plaintiff must allege: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her membership in a protected class; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability."  *Levitin v. Nw. Cmty. Hosp.*, 64 F. Supp. 3d 1107, 1124 (N.D. Ill. 2014) (citing *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378,

---

[2]  The Court notes that Plaintiff does not allege that her reassignment to another yard was an act of discrimination.  [See 1, at Count I ¶ 26, Count II I ¶ 26].  Rather, Plaintiff alleges that her reassignment was part of her retaliation claim.  [See *id.*, at Count III ¶¶ 25–26.]

383 (7th Cir. 2012)). The City challenges the third and fourth elements of Plaintiff's hostile work environment claims.

### 1.  Employer Liability

Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. See *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013); *Burrell v. United Parcel Serv., Inc.*, 163 F. Supp. 3d 509, 523 (N.D. Ill. 2016), reconsideration denied, 2016 WL 4720024 (N.D. Ill. Sept. 8, 2016). An employer can be vicariously liable for a hostile work environment created by a supervisor but is only liable for a hostile work environment created by a co-worker if the employer was negligent in discovering or remedying the harassment. *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). For purposes of Title VII, a "supervisor" is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.* This power includes generally "the authority to hire, fire, promote, demote, discipline or transfer." See *id.*

The City argues that Plaintiff fails to allege facts sufficient to satisfy the element of employer liability. In the City's view, Plaintiff's allegations fail to address whether Adams had the authority to fire, transfer, demote, or reduce Plaintiff's compensation. The City argues that the fact that Adams may have overseen Plaintiff's daily activities is insufficient to impose liability on the City.

The Court disagrees. Plaintiff alleges that Adams was the "Yard Supervisor" and further alleges that Adams "possessed" and was "delegated final policymaking authority for personnel issues arising within the Department of Sanitation at the 52nd and Oakley Yard." [1, at ¶ 4.] Plaintiff further alleges that Adams took disciplinary action against her following her reports of

discrimination, and nothing in the record as it stands suggests that this disciplinary decision had to be approved by anyone else before disciplinary action could be taken. [*Id.* at ¶ 25]; cf. *Andonissamy*, 547 F.3d at 848 (although harasser was supervisor in a colloquial sense and recommenced disciplinary action, the record shows that human resources first had to conduct an investigation and issue a recommendation before any disciplinary action could be taken, thus harasser did not possess authority that would make him a supervisor for purposes of Title VII). Plaintiff also alleges more generally that Adams had the authority to "adversely affect[ ] the terms and conditions of her employment." [See *id.*] Construing all inferences in favor of Plaintiff, as the Court must at this juncture, Plaintiff's allegations are sufficient to allege employer liability. Defendant argues that Plaintiff is incorrect that Adams had "finally policymaking authority," but this is not a proper determination at the motion to dismiss stage, where the Court must accept Plaintiff's allegation that Adams was "delegated final policymaking authority for personnel issues arising within the Department of Sanitation at the 52nd and Oakley Yard," [1, at ¶ 4], and thus infer that Adams had authority over personnel issues such as hiring, firing, promoting, demoting, disciplining, or transferring plaintiff. See *Andonissamy*, 547 F.3d at 848.

Further, Plaintiff would also be able to proceed with her claim under a theory of co-worker harassment. Plaintiff she alleges that she complained about Adams's behavior to Jay, a "supervisor at the downtown Chicago office of the Department of Street and Sanitation" on several occasions during the early half of 2015, [1, at ¶ 23], that she further reported his behavior to several other supervisors and 16th Ward Superintendent Wilson, [*id.* at ¶ 24], that she provided a written complaint to disciplinary officer Scott, [*id.*], and that she reported Adams's behavior to Administrator Supervisor Gay, [*id.*] but that no immediate or effective action was taken. See

*Burrell*, 163 F.Supp.3d at 523 (employer liable for harassment by co-worker if employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice"). Thus, the City's motion to dismiss based on a failure to allege employer liability is denied.

### 2.  Severe or Pervasive Conduct

A plaintiff bringing a hostile work environment claim must allege that the conduct in question was "severe or pervasive." See *Levitin*, 64 F. Supp. 3d at 1124 (noting that this element is in the disjunctive). This means that "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Hall*, 713 F.3d at 330. When addressing this element, the Court must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Levitin*, 64 F. Supp. 3d at 1124 (citation and internal quotation marks omitted). In doing so, the Court must bear in mind that Title VII does not impose a "general civility code" in the workplace, and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 1125–26 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, (1998); *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004)). Seventh Circuit precedent does not limit hostile environment claims to situations in which the harassment was based on sexual desire; rather, the harassing comments can be sexist, rather than sexual. See *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).

The City argues that Plaintiff fails to adequately allege severe or pervasive conduct to support her claim of a hostile work environment based on her gender. According to the City,

13

Adams's alleged comments "may be inappropriate and unpleasant" but objectively do not rise to the level of an actionable hostile work environment. The City also argues that Plaintiff fails to allege that the statements affected her work performance.

The Court disagrees. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Hall*, 713 F.3d 331 (citation and internal quotation marks omitted). Here, Plaintiff alleges that she was subjected to disadvantageous conditions of employment, such as being prohibited from entering the "shop" at the yard to check on the sanitation trucks despite the fact that her job required her to do so and despite the fact that her male counterparts were permitted to do so, being prohibited from using her cell phone whereas male employees were permitted to do so, and being refused training that was provided to her male colleagues. [1, at ¶ 17.] Plaintiff further alleged that unlike her male colleagues, she was forced to log incoming trucks while standing outdoors, instead of in the office window, even in the harshest of weather conditions. [*Id.*] Contrary to the City's contentions, Plaintiff does allege that Adams's harassment affected her ability to perform aspects of her job, such as entering the "shop" to check on the sanitation trucks.

Additionally, "[t]here is no question that gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment." *Passananti v. Cook Cty.*, 689 F.3d 655, 668 (7th Cir. 2012). Plaintiff alleges that on a daily basis, Adams made derogatory comments to Plaintiff about the fact that she should not have her position because she was a woman, stated that "women should be at home" and that "you women are worthless." She contends that he stated that Plaintiff was "nothing a bullet won't cure," repeatedly screamed and adopted a demeaning tone toward Plaintiff, and repeatedly used the

exclamation "Women!" when walking away from Plaintiff following discussion. Additionally, Adams allegedly made comments about Plaintiff learning to lie on the ground. See *Boumehdi*, 489 F.3d 789 (7th Cir. 2007) (supervisor's comments, including "that women do not belong in the pressroom and think they know everything" as well as comments directed at plaintiff based on how she should dress or how she was positioned were both severe and pervasive enough to survive summary judgment).

Importantly, Plaintiff alleges that Adams engaged in this behavior "continually and on a daily basis, commonly in the presence of multiple Streets and Sanitation employees." [*Id.*, at ¶¶ 17–18.] Thus, the Court concludes that Plaintiff has sufficiently alleged pervasive conduct to support her claim of a hostile work environment based on her gender. See *Haugerud*, 259 F.3d at 694 (concluding that although incidents were not particularly severe, they were sufficiently pervasive where defendants questioned plaintiff's abilities and the ability of women to do her job in general, plotting to give her job to a male counterpart, increasing her duties in an attempt to make her quit, withholding necessary assistance, and making discriminatory comments); *Hall*, 713 F.3d 325 (questioning whether alleged harasser's individual acts, taken along, were sufficiently severe to constitute a hostile workplace, but concluding that taken together, incidents that "consistently or systematically burden women throughout their employment are sufficiently pervasive to make out a hostile work environment claim," where plaintiff alleged that she was assigned the responsibility of reviewing useless videotapes, her colleagues were forbidden from speaking to her, she was prohibited from meetings, her efforts to take on more work were suppressed, and alleged harasser subjected her to occasional verbal outbursts as well as one minor physical altercation); *U.S. E.E.O.C. v. Cont'l Airlines, Inc.*, 2006 WL 14510, at *4, *15 (N.D. Ill. Jan. 3, 2006) (denying summary judgment where plaintiff's co-workers made between

fifteen and twenty sexist remarks over one year, including comments that she should go home and cook for her husband and that she was doing "a man's job," and noting that the harassment was not occasional, infrequent, or isolated).

The City argues that courts have held that conduct "significantly more egregious than what [Plaintiff] alleges in the instant case did not rise to the level of actionable harassment." However, the cases on which the City relies are all distinguishable because they involved infrequent offensive comments, whereas here, Plaintiff alleges that Adams harassed her "continually and on a daily basis." See [1, at ¶¶ 17–18]; *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (explaining that "lamentably inappropriate" behavior did not create a hostile work environment "due to the limited nature and frequency of the objectionable conduct"); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-related comments over the course of plaintiff's employment "were too isolated and sporadic to constitute severe or pervasive harassment"); *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (noting that the offensive statements directed to plaintiff were "few and far between" and that most of harasser's offensive conduct was directed not to plaintiff but to her co-workers); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."). In sum, the City's motion to dismiss Plaintiff's hostile work environment claim on this basis in denied. See *Haugerud*, 259 F.3d at 694 (explaining that alleged conduct "might have indeed been harassing" and reversing summary judgment on hostile work environment claim, but also holding that alleged conduct did not result in any materially adverse change in the terms, conditions, or privileges of plaintiff's

employment, and this affirming summary judgment for defendant on gender discrimination claim); *Mangano v. Sheahan*, 2002 WL 1821738, at \*6–\*9 (N.D. Ill. Aug. 7, 2002) (granting summary judgment for defendant on discrimination claim based on lack of adverse employment action but denying summary judgment on hostile work environment claim).

### C. Municipal Liability

Under 42 U.S.C. § 1983, a person may sue anyone who, while acting under color of law, causes him to be deprived of any of his constitutional rights. 42 U.S.C. § 1983; *Connick v. Thompson*, 563 U.S. 51, 60–62 (2011). A municipality can be held liable under § 1983 only "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy," causes the constitutional deprivation. *Monell v. Department of Social Serv.*, 436 U.S. 658, 694 (1978). "A municipality may not be held liable under § 1983 on a respondeat superior theory." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001) (citing *Monell*, 436 U.S. at 690). To state a claim for municipal liability, a plaintiff must allege that the violation of his rights was caused by "(1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Id.* Here, Plaintiff relies on the second and third prongs for her *Monell* claims, alleging that the City had a "custom or practice of non-response to complaints of discrimination and retaliation" and that the discrimination was carried out by individuals with final policymaking authority.

The City contends that Plaintiff's complaint fatally lacks the requesite specificity to allege a plausible *Monell* claim. The City argues that Plaintiff only references her personal

experience and fails to allege any facts suggesting "widespread or systemic constitutional violations of which policymakers were aware and to which they acquiesced." [13, at 12.]

The Court is not convinced. Plaintiff alleges that Gay, Cruz, Keag, and Ray all knew about Plaintiff's complaints of racial and gender discrimination and harassment yet failed to adequately respond. [1, at ¶¶ 23–24, 28 ("Janet Gay, Josie Cruz, "Jay," "Ray" and Adams never adequately responded to plaintiff's complaints and thereby approved, condoned, and/or turned a blind eye to the discrimination and harassment by Adams[.]").] Plaintiff further alleges that the City's Streets and Sanitation personnel, including but not limited to Adams, Gay, Cruz, "Jay," and "Ray" allowed black and female employees to be subjected to a pattern and practice of discrimination and retaliation based on gender or race. [*Id.*, at Count IV ¶ 52.] Additionally, Plaintiff states in her complaint that the actions of the City employees in failing to take any immediate corrective action to prevent or prohibit instances of race or gender discrimination and harassment and in retaliating against Plaintiff for speaking out about race and gender discrimination and harassment were part of the City's unofficial policy and that the City had a "systemic policy and/or custom of race and gender discrimination and harassment[ ] and retaliation." [*Id.*, at Count IV ¶¶ 58–59]; see *Barwicks v. Dart*, 2016 WL 3418570, at *2 (N.D. Ill. June 22, 2016) (noting that "[i]n order to allege a widespread policy, the Supreme Court and the Seventh Circuit have both looked for circumstances demonstrating that municipal officials were deliberately indifferent to known or obvious consequences of the municipality's action or inaction" and collecting cases).

The City argues that these are "conclusory allegations" that are insufficient to state a claim for municipal liability. However, the Seventh Circuit recently has cautioned that district courts may not apply a "heightened pleading standard" to *Monell* claims. *White v. City of*

18

*Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), cert. denied, 137 S. Ct. 526, (2016) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). Rather, Federal Rule of Civil Procedure 8(a)(2) requires that a complaint include only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* In *White*, the plaintiff brought an individual claim against an officer for violation of his Fourth Amendment rights and also alleged that the officer acted "in accordance with a widespread practice of the police department." 829 F.3d at 844. The Seventh Circuit held that the district court had erred (albeit harmlessly) in holding that the plaintiff "failed to state a *Monell* claim because his claim was 'based upon the sole allegation that [the officer] acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant.'" *Id.* The Seventh Circuit explained that the plaintiff's allegation was enough to satisfy the "short and plain statement of the claim" requirement of Rule 8(a)(2) and that "was not required to identify every other or even one other individual" whose rights had been violated by the complained-of process." *Id.*

Under the binding precedent set by *White*, 829 F.3d at 844, Plaintiff's allegations of a pattern or practice of ignoring complaints of discrimination are enough to survive a motion to dismiss. Post-*White* courts analyzing *Monell* claims similarly have "scotched motions to dismiss" premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff. *Stokes v. Ewing*, 2017 WL 2224882, at *4 (N.D. Ill. May 22, 2017) (plaintiff's allegations that he was falsely arrested pursuant to a "custom, practice, and policy" that "promoted illegal arrests of innocent individuals" sufficient to survive a motion to dismiss under *White*); *Kerlin v. Chicago Board of Elections*, 2017 WL 1208520, at *6–7 (N.D. Ill. Apr. 3, 2017) (relying on *White* and denying motion to dismiss where plaintiffs identified a specific

constitutional deprivation of their right to vote and alleged a "pervasive and widespread de facto policy, practice, and procedure of willfully disregarding citizens' right to vote"); *Zinn v. Village of Sauk Village*, 2017 WL 783001 (N.D. Ill. Mar. 1, 2017) (holding that plaintiffs sufficiently pled a *Monell* claim under *White* where plaintiffs alleged that they suffered a constitutional deprivation "pursuant to [defendant village's] widespread practice of illegally and unconstitutionally seizing private property" and charging monetary fees for its return).

To be sure, the Court does not opine on Plaintiff's chances of success on the merits, but is merely concluding that at the current procedural posture, Plaintiff's complaint adequately meets the pleading requirements of Rule 8(a). See *Barwicks*, 2016 WL 3418570, at *4 (noting that at summary judgment, plaintiff's single incident cannot give rise to *Monell* claim, but explaining that at the motion to dismiss stage, Plaintiff "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists" (emphasis in original)).

The City also argues that Plaintiff fails to allege facts sufficient to satisfy the "final policymaker" prong of *Monell*. First, the City contends that Plaintiff's allegations are insufficient because supervisory personnel at the Department of Streets and Sanitation are not final personnel policymakers for the City. Whether a particular official has final policymaking authority is a question of state law. *Harris v. City of Chicago*, 665 F. Supp. 2d 935, 947 (N.D. Ill. 2009). Simply because an official has discretion to act or "authority to make administratively final decisions" does not make that individual a final policymaker for purposes of *Monell* liability. *Id.* (quoting *Radic v. Chicago Transit Authority*, 73 F.3d 159, 161 (7th Cir. 1996)). Rather, policymakers are those who possess "authority to adopt rules for the conduct of government." *Id.* (citation and internal quotation marks omitted).

"Under Illinois law, the city council possesses the requisite authority to adopt rules for the conduct of government, and thus is considered the policymaking authority." *Id.* Consequently, the Chicago City Council has final policymaking authority for the City. *Id.* The relevant inquiry here, then, is whether Plaintiff sufficiently alleged that the Chicago City Council has delegated authority to set policy related to discrimination and responding to complaints of discrimination to the Department of Streets and Sanitation supervisory personnel named by Plaintiff, including Janet Gay, Josie Cruz, "Jay," and "Ray." Cf. *id.* (granting summary judgment where plaintiff "cites no evidence in support of his contention that the City has delegated final policymaking authority to either the DSS or the HR Board"). The Court concludes that Plaintiff adequately alleges that the Department of Streets and Sanitation supervisory personnel, "including, but not limited to Adams, Janet Gay, Josie Cruz, 'Jay,' and 'Ray,'" "either possessed or had been delegated final policymaking authority by [the City] with regard to personnel issues within the Department of Streets and Sanitation." [1, at ¶ 57.] Whether or not Plaintiff will be able to proffer evidence to support this allegation is a question for summary judgment.

Finally, the City argues that it has an express policy prohibiting race or gender discrimination in employment, prohibiting sexual harassment, and prohibiting retaliation. The City contends that to the extent the named individuals violated the City's express policy, it is the City's express policy which governs for purpose of determining the City's liability under § 1983, citing *Waters v. City of Chicago*, 580 F.3d 575, 582 (7th Cir. 2009). However, the Court again concludes that this is an argument proper for summary judgment, not for a motion to dismiss. Thus, Plaintiff's *Monell* claim survives the City's motion to dismiss.

### D.    Adams's Individual Liability

#### 1.    42 U.S.C. §§ 1981 and 1983

In Count V, Plaintiff brings a claim against Adams alleging race and gender discrimination and harassment and retaliation pursuant to 42 U.S.C. §§ 1981 and 1983.  Adams argues that since Adams is employed by a municipality and is thus a state actor, Plaintiff cannot bring a § 1981 claim against Adams and that § 1983 is her exclusive remedy, citing *Campbell v. Forest Preserve of Cook County*, 752 F.3d 665, 671 (7th Cir. 2014).  In Adams's view, Plaintiff's § 1981 claim should thus be dismissed.

However, Adams's argument is based on an incorrect reading of *Campbell*.  *Campbell* held that "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors."  752 F.3d at 671.  Thus, the Seventh Circuit concluded that the district court had properly dismissed the plaintiff's § 1981 claim, since "§ 1981 does not create a private right of action against state actors."  *Id.*  In *Campbell*, because the district court had already dismissed the plaintiff's § 1983 claims as untimely, *id.* at 666, the plaintiff could not bring an independent § 1981 claim.  *Id.* at 671.

Thus, under *Campbell*, 752 F.3d at 671, Plaintiff could not bring her claims solely under § 1981, since "§ 1981 does not create a private right of action against state actors."  However, Plaintiff is not attempting to bring a standalone § 1981 claim.  Rather, Plaintiff brings her § 1981 claims pursuant to § 1983, which is proper.  Section 1981 prohibits racial discrimination in the making and enforcing of contracts.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  And § 1983 serves as a "vehicle for vindicating federal rights elsewhere conferred." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) (citation and internal quotation marks omitted).  Therefore, Plaintiff may use § 1983 as a vehicle to vindicate her substantive

22

rights under § 1981.  See *Matthew v. Hughes*, 2015 WL 5876567, at \*5 (N.D. Ill. Oct. 5, 2015) (concluding that plaintiff's § 1981 claim was properly brought under § 1983); *Barrett v. Illinois Cmty. Coll. Dist. No. 515*, 2015 WL 4381218, at \*3 (N.D. Ill. July 16, 2015) (denying motion to dismiss § 1981 claims and holding that § 1981 claims could be brought through § 1983, even though plaintiff did not explicitly cite § 1983 in his complaint).

### 2. Race and Gender Discrimination: Disparate Treatment

Next, Adams argues that Plaintiff's disparate treatment claim against him must be dismissed because Plaintiff does not allege a materially adverse employment action.  As discussed above, the Court agrees that Plaintiff does not sufficiently allege a materially adverse employment action, and thus her disparate treatment claim must be dismissed.

### 3. Hostile Work Environment

Adams argues that Plaintiff fails to plead facts supporting her allegations of a hostile work environment claim.  Adams argues that Plaintiff's allegations of gender discrimination are not sufficient in terms of their frequency and severity to satisfy the severe or pervasive requirement.  However, the Court already has rejected this argument above.

Next, Adams argues that Plaintiff's claim of racial harassment is similarly insufficient to state a claim.  Adams contends that Plaintiff fails to describe with any detail the frequency of the language she attributes to Adams.  This is incorrect.  Plaintiff alleges that racially discriminatory comments by Adams and others were "an everyday occurrence at Plaintiff's workplace during the relevant period of her tenure working in the office at the yard."  [1, at ¶ 21.]  Adams further argues that "[t]he language described by Plaintiff is abhorrent," but "much of it is so common in today's society that federal courts would quickly be overwhelmed if a cause of action for money damages arose every time an employee uttered such words."  Again, the Court disagrees.

Plaintiff alleges that Adams prohibited Plaintiff from fulfilling some of her job duties and refused to provide her training based on her race, thus affecting her ability to do her job. [See 1, at 20.] She further alleges that Adams repeatedly made reference to African American employees as "you black people" in a derogatory manner and stated that black people should not have the E-Person position and that black women are worthless. Plaintiff contends that Adams repeatedly used the term "nigga," and permitted employees to use the word "nigger" if they put five dollars into the office "swear jar." [See *id.*, at ¶¶ 20(a), (b), (e) (f).] See *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word "nigger" can have a highly disturbing impact on the listener."); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (citation and internal quotation marks omitted)). Plaintiff has sufficiently pled a hostile work environment claim based on racial harassment.

### 4. Retaliation

Finally, Adams argues that Plaintiff fails to state a viable claim for retaliation. Plaintiff purports to bring her retaliation claim pursuant to § 1981 and § 1983. Plaintiff also argues that she alleges a First Amendment retaliation claim against Adams.

Adams argues that Plaintiff fails to state a claim for retaliation under the Equal Protection Clause and Title VII. The Court agrees. To the extent that Plaintiff attempts to bring a retaliation claim under the Equal Protection Clause, this claim must fail. As Adams points out, and Plaintiff does not challenge, the Seventh Circuit has explained that "the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal

protection clause." *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004); see also *Locke v. Haessig*, 788 F.3d 662, 672 (7th Cir. 2015) (explaining that the Equal Protection Clause does not establish a general right to be free from retaliation). Further, as Adams points out, and Plaintiff does not challenge, Plaintiff cannot bring a Title VII claim against Adams in his individual capacity. See *Williams v. Banning,* 72 F.3d 552, 552 (7th Cir. 1995) (affirming dismissal of plaintiff's Title VII action filed solely against her former supervisor and explaining that "Title VII does not impose 'employer' liability on a supervisor in his individual capacity for acts which violate the statute").

Thus, Plaintiff fails to state a claim for retaliation based on her complaints of gender discrimination. However, Plaintiff also alleges that she complained about race discrimination, [see 1, at ¶¶ 23–34], and then Adams retaliated against her, by, for example, falsely disciplining her for "disrupting his yard," [*id*, at ¶ 25.] The Court concludes that Plaintiff states a claim under § 1981 for retaliation based on her complaints of race discrimination. See *O'Leary*, 657 F.3d at 630 (Section 1981 prohibits retaliation for opposing race discrimination in the making and enforcing of contracts).

Plaintiff argues that she also states a First Amendment retaliation claim against Adams. However, although Plaintiff alleges in Count IV that the City violated her First Amendment rights, [see 1, at Count IV, ¶¶ 53–55, 59–60], Count V against Adams makes no mention of Plaintiff's First Amendment rights and does not allege that Plaintiff engaged in protected speech, [see *id.*, at Count V]. See *Hoffman v. Dewitt Cty.*, 176 F. Supp. 3d 795, 804 (C.D. Ill. 2016) ("To present a claim for First Amendment retaliation, Hoffman must plausibly allege that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the protected activity or speech was

at least a motivating factor for the deprivation."). Thus, Plaintiff fails to state a claim against Adams for First Amendment retaliation.

## IV. Conclusion

For the foregoing reasons, the City's motion to dismiss [12] is granted in part and denied in part, and Adams's motion to dismiss [19] is granted in part and denied in part. Plaintiff is given until August 25, 2017 to file an amended complaint consistent with this opinion, if Plaintiff believes that she can overcome the deficiencies identified below. This case is set for further status hearing on August 31, 2017 at 9:00 a.m.

Dated: July 26, 2017 _____
Robert M. Dow, Jr.
United States District Judge